APARTMENT HOTEL OWNERS ASSOCIATION, INC., Plaintiff, *v.* CITY OF NEW YORK and Others, Defendants.*

Supreme Court, New York County, March —, 1929.

*M. Carl Levine,* for the plaintiff.

*George P. Nicholson, Corporation Counsel [Arthur J. W. Hilly* and *F. E. V. Dunn* of counsel], for the defendants.

BIJUR, J. Plaintiff is a membership corporation composed of thirty-seven owners of what it calls " apartment hotels." By the complaint, which has been held sufficient by the Appellate Division (224 App. Div. 717), it asks to enjoin the city of New York from enforcing against these buildings the provisions of the Tenement House Law. As the buildings are not wholly alike, either in construction or operation, it is impossible to try the issues as though but a single one were involved. Necessarily the evidence has been of a general nature, with a view of ascertaining an average or typical condition. Consequently my conclusions cannot be expressed in other than general terms. Whatever the result of the suit I assume that it cannot be regarded as an adjudication of the status of any particular building. The controversy concerns immediately the question whether the buildings of plaintiff's members come within the definition of a tenement house as set forth in subdivisions 1 and 11 of section 2 of article 1 of the Tenement House Law, reading as follows: " 1. A

* But, see, Multiple Dwelling Law, as added by Laws of 1929, chap. 713.

' tenement house ' is any house or building, or portion thereof, which is either rented, leased, let or hired out, to be occupied, or is occupied, in whole or in part, as the home or residence of three families or more living independently of each other, and doing their cooking upon the premises, and includes apartment houses, flat houses and all other houses so occupied (as amd. by Laws of 1912, chap. 13).  *  *  * 11.  *  *  *  Wherever the words ' is occupied ' are used in this chapter, applying to any building, such words shall be construed as if followed by the words ' or is intended, arranged or designed to be occupied ' " (as amd. by Laws of 1917, chap. 806). Defendant's contention is that the presence of " serving pantries " as constructed and used in the private apartments brings the buildings within the definition.  The apartments consist generally of one, two and three rooms, and in those of more than one room there is a compartment or small room called a " serving pantry," running in size up to about eight by twelve feet, which contains a sink, an ice box, shelves or cupboard, and an electric outlet into which can be inserted the ordinary portable electric plug. In very many instances electric ranges of varying dimensions have been installed in these pantries and they are being used by the guests with the knowledge of the owners of the buildings for the preparation of meals with more or less regularity.  This use varies from the preparation of breakfasts only or light lunches to the cooking, in some cases at least, of all the meals for a family of four. The owners of some of the buildings suggested the possibility of so using the pantries in their advertisements.  There is no doubt that the buildings have generous and frequently elaborate accommodation for serving meals to the occupants in large public dining rooms with ample kitchen and pantry accommodations.  In some buildings no cooking is permitted in the private apartments.  But generally, guests whenever they see fit, avail of the " serving pantries " to cook their own food.  I come then to the question whether the guests or tenants live, as phrased in the statute, " independently of each other," and more particularly whether they are " doing their cooking upon the premises."  I think it quite probable that one of the purposes of prescribing that the families must be " living independently of each other " was to differentiate between families in the strict sense of the word, i. e., married couples and their own children, and combined " families " composed, for instance, of such couples and their married children and grandchildren or other relatives.  In other words, I think that the intention was to describe " households " rather than families.  But plaintiff contends in substance that its guests do not live independent of each other, because of the enjoyment of many common facilities.  It is quite

apparent that strictly speaking no one in the city of New York lives independently of anybody else. All enjoy the benefits and protection of the several city departmental agencies and of various public utilities. The same is true both of hotels and apartment houses. There are to-day so many common conveniences, such as elevators, interior telephones, heating, lighting, window cleaning and the like that no occupants can be said, strictly speaking, to live independently of the others. It seems to me to be clear that the added description " doing their cooking on the premises " was intended to clarify the first phrase and to emphasize its content as signifying households. This thought is clearly expressed in *People* v. *Shkilky* (201 App. Div. 55, 57): " A building is not a ' tenement house ' within the statutory definition unless the occupants live independently of each other. Persons may be said to live in premises when they maintain their family life there. This includes cooking as well as sleeping, and I think they cannot be said to live independently unless they cook in their own apartments as distinguished from a kitchen used in common." In regard to the element of cooking, plaintiff stresses the fact that the statute does not say " cooking " nor " any cooking," but " *their* cooking." He fails to take into account, however, the fact that the statute also does not say " *all* their cooking." Of course, it never was intended in the definition to suggest that any family or household *must* cook *all* its meals on the premises, or even to define the exact extent to which such cooking must go. Necessarily that would vary according to the individual means, wants and tastes of each family. While, perhaps, the " serving pantries " now in question were not designed for the preparation of elaborate meals for many persons simultaneously, there can be prepared therein meals quite as extensive in number of dishes and content as were cooked in many of the tenement houses of thirty or forty years ago. Furthermore, the very design of these " apartment hotels " indicates that they are intended to accommodate small families. If the facilities of the " pantry " or kitchenette are more limited than those of the cook stove of old, it is evident that the demands upon it have diminished proportionately. The definition in the Tenement House Law does not aim at measurement by yardstick or cubic content. The so-called serving pantries were either designed or made apt for the preparation of meals by and for the occupants of the several apartments, and they are so used in a fairly large proportion of cases. Moreover, one of the general arguments of plaintiff's counsel is to the effect that the buildings of the plaintiff's members fill a present want felt by small families which, under present labor conditions, are disinclined to ordinary housekeeping; that what they desire now is

apartments where they may enjoy the dual advantage of meals from a general kitchen when desired and of " light housekeeping " whenever they prefer to eat in their own apartments; in other words, the very accommodations offered by plaintiff's members fill an immediate want of tenants. If that be so, then in a literal sense the cooking done in these apartments is, as to the occupants, " their cooking." This is emphasized by the unwillingness of plaintiff's members to accept the city's proposal to be satisfied with a discontinuance of the conveniences for cooking, as, for example, by removing the electric outlet. The refusal indicates that the accommodation for cooking sought to be treated by plaintiff in argument as negligible is in reality important and intrinsic in the very scheme of the buildings. Nor may it be overlooked that the Legislature sought to define the building by the character of the residence, and not to control or direct an amount or kind of cooking. In my opinion the language of the statute designates the accommodations and practices in plaintiff's buildings. But if for any reason the application of the definition be doubted or the language be deemed ambiguous it is well established that the uniform practice of public officers in interpreting statutes, particularly with the acquiescence of the citizens affected, is highly persuasive in determining their exact meaning. (*City of New York* v. *N. Y. City R. Co.*, 193 N. Y. 543, 548; *People ex rel. W. S. El. Co.* v. *C. T. & E. S. Co.*, 187 id. 58, 66, 67; *United States* v. *Finnell*, 185 U. S. 236, 244; *Matter of Board of Street Opening*, 12 Misc. 534; affd., 91 Hun, 477; affd., 149 N. Y. 575.) In this connection the testimony of the superintendent of buildings and other city officials is significant. It is to the effect that some time in 1905 when plans were filed which indicated the installation in some of plaintiff's buildings of these " serving pantries " the owner or architect was asked the purpose of these rooms, the department having heard that some had been used for cooking. The owners were informed that the bureau of buildings considered these structures on the border line of tenement houses. It became thereafter a fairly uniform requirement of the department to demand a statement or affidavit from the architect or owner that the serving pantries would not be used for cooking and in the certificate of occupancy there was inserted a restriction to that effect. Plaintiff's counsel has urged that cooking in the separate apartments is as common in transient hotels as in the so-called apartment hotels represented by plaintiff. I am unable to appreciate the force of the argument, assuming the fact to be as claimed. Whether and to what extent, if it exists, it is a violation of the Tenement House Law or of any other statute or ordinance is not at issue before me, nor would the fact that in some other form of building there was some similar or partly similar condition aid in determining

whether plaintiff's constituents were within the definition. Plaintiff, however, has not only failed to establish the fact claimed, but it appears from the evidence that the transient hotels are active in an endeavor to suppress cooking in the individual rooms or apartments. Assuming, however, that the fact had been established and that it had some bearing on the question which I am called upon to determine, it is apparent that there is a broad dividing line between the casual occurrence of cooking in surroundings wholly unfitted for that purpose and the invited or permitted, or at least tolerated, practice of cooking in a setting either designed for or thoroughly appropriate to that end. Plaintiff argues also that its " apartment hotels " are to be regarded as hotels rather than as apartment houses. So far as mere phraseology is concerned nothing is to be gained by discussing their similarity to " hotels," first, because hotels as such are not defined in either the Building Code (chap. 5 of the New York Code of Ordinances) or in the Tenement House Law. Moreover, so far as the meaning of the word " hotel " has been discussed in recent cases in connection with exemption from taxation under the housing laws (City Ordinance No. 112 and Laws of 1922, chap. 281, amending Tax Law, § 4-b), the tendency has been to regard buildings resembling those operated by plaintiff's members as apartment houses rather than hotels. (See *People ex rel. Waitt Operating Co., Inc.,* v. *Goldfogle,* 121 Misc. 341 [1923]; affd., 208 App. Div. 834; 239 N. Y. 522; *Waitt Construction Co.* v. *Chase,* 197 App. Div. 327 [1921].) I, however, draw no pertinent inference from these decisions because the relation in which the meaning of the word was considered was wholly different from that involved in the present case. But the chief reason why mere comparison with " hotels " strikes me as immaterial is that — assuming a similarity in many respects — the immediate question here is whether plaintiff's buildings are not by reason of the presence of the serving pantries — used and available for use as kitchenettes — so clearly identifiable with apartment houses, that they fall within the definition of the Tenement House Law. Plaintiff also lays considerable stress upon the importance of the words " apartment hotel " and argues the significance of the omission of those words from the last clause of the definition of a tenement house, *supra* (as amd. by Laws of 1912, chap. 13), *i. e.,* " and includes apartment houses, flat houses and all other houses so occupied." This omission, however, and other facts concerning the use of the name cannot be understood without consideration of another important fact that was developed upon the trial. Plaintiff's argument is that the omission of the words " apartment hotels " from the amendment of 1912 indicates that the Legislature considered them outside the scope of the Tenement House Law.

I am quite sure that the Legislature intended to exclude them, but only in the sense in which the name was then understood, namely, as " family hotels " in which there were no cooking facilities in the several apartments. The testimony before me shows that the phrase " apartment hotel " originated about 1900 and was used interchangeably with the words " family hotel " to describe hotels which made a practice of renting apartments for fixed periods, the lessees or guests being treated in other respects like the transient guests of the house. There was no thought of distinguishing between hotels in which no cooking was done by the guests and those in which such cooking was practiced, because there were none of the latter class. Indeed, the superintendent of buildings testified that although he had known the term " apartment hotel " for more than twenty-five years, possibly ninety per cent of those with " serving pantries " had been constructed since 1916; and a well-known architect produced as a witness for the plaintiff testified that although he had known the term " family hotel " for possibly thirty years, he had not heard of " apartment hotels " until about 1920, when it was applied to buildings like those of plaintiff's members, containing the so-called " serving pantries." It must, therefore, be borne in mind that wherever the name " apartment hotel " is found either in earlier statutes, opinions of the courts or arguments of counsel, it should not be read as meaning a building designed or used for cooking in the several apartments, since that type of structure was then unknown. The name appears to have been arbitrarily applied by the plaintiff to the buildings of its members, or perhaps it may be more accurate to say that plaintiff's members continued the use of the name, but changed the character of the structures to which it had formerly applied, by making provision for cooking in the several apartments. As late as 1921 we find the Appellate Division of this department in *Waitt Construction Co.* v. *Chase* (197 App. Div. 327, 330), saying: " An apartment hotel, so called, is generally understood to apply to those houses which contain non-housekeeping apartments without a kitchen or cooking facilities, wherein the proprietor furnishes a restaurant for feeding the occupants of the different apartments. Within this terminology the George Washington might be classed as a hotel, because the apartments were rented without cooking facilities and without kitchens." Plaintiff's counsel also refers to the definition of an " apartment hotel " in Laws of 1905, chapter 206, amending section 181 of the Lien Law which awards to the keeper of an " apartment hotel " a lien similar to that enjoyed by the keeper of an inn. The definition reads as follows: " An apartment hotel within the meaning of this section includes a hotel wherein apartments are rented for fixed

periods of time, either furnished or unfurnished, to the occupants of which the keeper of such hotel supplies food, if required." I fail to appreciate the relevancy of that definition to the present controversy. In the first place, it is expressly limited by the words " within the meaning of this section," the intention being evidently to overcome decisions like *Shearman* v. *Iroquois Hotel Co.* (42 Misc. 217 [1903]) to the effect that the lien of a hotelkeeper on his guests' effects was limited to " transients." In the next place, the definition plainly describes the " apartment hotel " as known at the time (1905), namely, an ordinary hotel in which rooms were rented for longer terms than from day to day. Lastly, as the evidence before me establishes that there were no apartment hotels at that time like those of plaintiff's members, the definition is wholly without application to the instant situation. It is also urged by plaintiff that the Court of Appeals in *Grimmer* v. *Tenement House Department* (204 N. Y. 370 [1912]) held that an apartment house was not within the scope of the Tenement House Law because the latter was designed to protect the homes of the poor and did not apply to the residences of the rich, and that, therefore, I should be guided in the instant case by equivalent reasoning. It is true that that element is considered in the opinion of the court, but at least equal stress was laid on the fact that the then Building Code defined apartment houses specifically. (See *Bancroft* v. *Building Commissioner*, 257 Mass. 82, 88.) It is profitless, however, to argue whether the decision was based on the one or the other consideration or on both, for within a few weeks thereafter the Legislature amended the Tenement House Law to include " apartment houses, flat houses and all other houses so occupied." By this amendment the Legislature plainly indicated either disapproval of the reasoning of the court, or a changed intent on its own part, as recognized in *Altz* v. *Leiberson* (233 N. Y. 16, 18): " A ' tenement house,' as the meaning is enlarged by the definition of the statute, may include the dwellings of the rich." While on the subject of terminology it may be well to refer further to the testimony of the architect from which I have already quoted. According to him the origin of the " serving pantry " was the need of keeping plates and cooked dishes hot when served by hotels in dining rooms other than those immediately adjoining the main kitchen or pantry. After a while a few more ambitious hotels installed such pantries on various floors to enable efficient service of hot dishes to be made in the apartments of guests on the respective floors. But apparently at no time until the construction and operation of the buildings of the members of the plaintiff's association was there any recognized accommodation for heating dishes in the several apartments themselves. Plaintiff's counsel has urged a

number of so-called equitable considerations. Thus he stresses the fact that to remove the electric outlets in the serving pantries would result in great dissatisfaction on the part of tenants and ultimate substantial loss in rentals, and, further, that a decision to the effect that these buildings are within the scope of the Tenement House Law would make applicable the penalties provided in that enactment, such as rendering due the various mortgages and permitting the cancellation of existing leases. I doubt whether the latter results would eventuate because defendant offers so simple a remedy for the situation, *i. e.*, effectively discontinuing the conveniences for cooking. Moreover, the danger is not the result of any sudden or new interpretation of the statute. All these buildings have been erected on the express condition that there shall be no cooking in the several apartments. Plaintiff also complains that the municipal authorities have permitted the present conditions to continue for a considerable time. I am unable to appreciate the juridical significance of the point. It is not contended that the public authorities can be estopped from enforcing a statute where no discretionary permit is provided for. (See *Altschul* v. *Ludwig*, 166 N. Y. Supp. 529, 534.) In the same connection plaintiff has criticised the action of the authorities as having been recently stimulated by private interests, namely, the owners of transient hotels and of apartment houses. It seems to me that the impulse toward halting violations of law may quite properly come from individuals who are adversely affected thereby. Finally, plaintiff's counsel has claimed that the necessities of modern life have compelled the erection of these buildings in the form in which they exist and are used in order to fill a new and peculiar want in New York city. He says: " There is no use in dodging the facts — light cooking in apartment hotels — in fact in every hotel — is an established institution in New York city. * * * There is no denying the fact that the people of the city who come to live in apartment hotels do so with a feeling that when they have an occasional desire to do some cooking the facilities are there for it, although not a single woman could be found who would say that the facilities of a serving pantry are such as to be conducive towards substantial cooking." He argues, therefore, that a discontinuance of the facilities complained of would be a retrogression from an advance in methods of housing and living in New York city. I can only say that that is wholly a legislative matter. The Legislature has prescribed the methods and standards of construction applicable to different classes of buildings, and to say that a disregard of these fixed standards represents an improvement or an advance is to beg the question. It is not the function either of courts or administrative officers to oppose their views of what is

good or advisable to a legislative enactment. This is not a question of modifying or adapting some general equitable rule to harmonize with changed human conditions, but one of applying a standard prescribed by the Legislature. For somewhat the same reason I have not undertaken to determine accurately what the particular purpose of the several provisions of the Tenement House Law may have been. One thing, however, has been made clear by the evidence before me, namely, that protection against fire was not the only purpose. Light, air, ventilation and general sanitation were perhaps the chief objects. In a remedial measure of this kind some fixed standards have to be established. Some persons may be of opinion that a differentiation between electric ranges and other electric appliances, or between cooking and other household practices, is not justified; but I repeat that the question whether some article or structure is as good or better or worse than another is for the Legislature, and its prescription is determinative. We have here a concededly remedial statute designed to protect the public interest. The definition of its scope is necessarily in rather general terms, in view of the fact that it deals with many classes of buildings, good, bad and indifferent. Many definitions in statutes of this kind may be analyzed and shown by a species of *reductio ad absurdum* to be apparently inapplicable, or at least of little use in a particular instance. That, however, does not present a juridical question. The question before me is whether the glove fits, not whether it is desirable. The Court of Appeals in the *Grimmer Case (supra)* did not undertake to weigh the value of the defined difference between " tenement houses " and " apartment houses," and was not affected by the argument (contained in one of the briefs submitted to it and filed with me by plaintiff here) that " the practical effect of the decision would be to reduce the question * * * solely to the presence or absence of ' separate set bathtubs ' for each family." Suffice it that the factors of the test have been prescribed and that it is the duty of the court to conform its decision thereto. I do not wish to be understood as belittling the force of some of plaintiff's criticisms to which I have just alluded. It may well be that some or all of them are worthy of serious consideration by the Legislature. If it regards them as well founded it has power not only to meet them directly, but it may so amend and adapt the law so that while excluding its operation in instances where experience may have shown that no serious harm to the public interest is threatened, its force may be preserved in cases where its application is deemed necessary. Complaint dismissed on the merits. Submit findings and judgment.