J. E. & A. REALTY CORP., Landlord, *v.* JAMES COULTER, Tenant.

Municipal Court of New York, Borough of Bronx, Second District,
December 24, 1938.

*Julius Riedler*, for the landlord.

*Barney Rosenstein*, for the tenant.

LEVY, J. This matter involves the construction and applicability, under the facts, of section 1436-a of the Civil Practice Act. Article 83 of the Civil Practice Act, which provides for " summary proceedings to recover possession of real property," was amended in 1930 (Chap. 820) by adding thereto the section in question. That section is entitled, " Discretionary stay where tenant holds over in premises occupied for dwelling purposes in New York city." In substance it empowers the court, upon application of the tenant, to stay the issuance of a warrant for a period not in excess of six months. A number of conditions must be satisfied before the court may grant this relief:

1. The landlord must have instituted a proceeding to recover the possession of premises.

2. The premises must be in the city of New York.

3. The premises must be occupied for dwelling purposes, other than hotel or lodging-house rooms.

4. The proceeding must have been brought upon the ground that the occupant is holding over and continuing in possession after the expiration of his term and without the permission of the landlord.

5. The proceeding must not have been brought to recover possession upon the ground that the occupant is objectionable to the landlord.

6. The landlord does not in good faith desire the premises for demolition so as to construct a new building pursuant to duly filed and approved plans.

7. A final order in favor of the landlord must have been granted.

8. The application for a stay must be made by the tenant in the court where the final order is granted.

9. The tenant's application must be made in good faith.

10. The applicant must not have been able, within the neighborhood, to secure suitable premises similar to those occupied by him; and he must have made due and reasonable efforts to secure such premises.

11. Or, by reason of other facts, it would occasion extreme hardship to the tenant or his family if the stay were not granted.

12. The tenant must deposit in court the unpaid rent, if any, and also the rent for use and occupation of the premises during the period of the stay, to be paid over to the landlord.

James Coulter, the tenant in the present proceeding, is colored. The premises — a five-room apartment on the second floor at No. 3777–3779 Third avenue, a tenement house in the borough of the Bronx, New York city — are used by the tenant and his family solely for dwelling purposes. The monthly rent is thirty-two dollars. The family consists of husband, wife and five children. The tenant has been unemployed for the past two years; he had been a worker on a Works Progress Administration relief project, but this job had been lost because of an accident in which he sustained an injury resulting in a hernia. He had recently been discharged from the hospital and was under treatment at the time of the hearing. Four of the five children attend school. One of these is afflicted with a heart disease. The family is on home relief.

The building in question is a multiple dwelling, housing a number of families. Some of the tenants seemed to have certain grievances against the landlord — whether those grievances are actual or

merely fancied is, as I see it, of no present moment. The tenants in the building began to organize a committee so as to present a united front in their dealings with the landlord. Active in the organization of that committee was Mrs. Coulter, the wife of the tenant involved in this proceeding. The landlord refused to recognize or confer with the committee, and soon was of the opinion that Mrs. Coulter was a " trouble maker." A written petition was presented to the landlord, signed by Mrs. Coulter as a member of the committee.

The landlord thereupon on October 29, 1938, duly served a thirty-day notice upon the tenant, terminating the monthly tenancy. Upon the tenant's failure to remove from the premises, the landlord instituted this proceeding in this court for possession of the premises, upon the ground that the occupant is continuing in possession after the expiration of his term and is holding over without the permission of the landlord. The landlord does not desire to demolish the premises — it is its wish to remove this tenant so as to make the vacated apartment available for renting purposes to others more to its liking. On December 8, 1938, when the dispossess proceeding came on for trial the tenant consented to a final order in landlord's favor. With the assistance of the relief allotments from the home relief bureau of the city of New York, the tenant is ready, able and willing to pay or deposit the rent as required by the statute. He now applies in this court for a stay of six months.

Ever since the landlord served the notice to vacate, the tenant has been seeking another apartment of a similar nature in various sections of the Bronx. Direct testimony of a *bona fide* search was presented to the court. In some buildings, negro tenants were not accepted. In others, the rent requested was beyond the tenant's means. In others, the available apartments were on the higher floors and, therefore, not acceptable in view of the ill health of tenant and child. Where, finally, a suitable apartment might have been found, the prospective landlord demanded a deposit on account of rent, which, in view of governmental home relief restrictions, and his own financial deficiencies, the tenant was unable to make.

Unlike the situation as presented in *Blek* v. *Davis* (193 App. Div. 215, 216), these facts were " shown to the court by evidence in a legal way." That the tenant tried to find other apartments in the same neighborhood for the same rental was proved as a fact before me at the hearing which was specifically held upon the tenant's application for a stay. Unlike *Kline* v. *Kleenan* (185 N. Y. Supp. 113, 114), the tenant here did not rely upon statements which

" amount to mere conclusions, and are not sufficient to establish the fact." The facts proved by the tenant were not contradicted by evidence on behalf of the landlord. During the hearing, the landlord argued that there were apartments available to the tenant; but the landlord refused to assure the court that if the tenant's application were denied, the tenant would actually have another dwelling available for him and his family.

In an effort to determine whether or not a shortage of low cost housing exists in New York city, a vacancy and rent survey was undertaken in December, 1937, at the request of the mayor. The report was made public on March 2, 1938. The co-operating agencies were the New York housing authority, the vacancy listing bureau (a project of the Works Progress Administration), the department of housing and buildings, and the research division of the department of welfare. The survey covered structures in which there were low rentals in all areas of Manhattan, the two predominantly low rental areas of the Bronx, seven areas of Brooklyn and three areas of Queens. Out of 765,415 dwelling units surveyed there were only 17,758 vacant apartments available at rentals of forty-five dollars or less per month. In other words, a city-wide vacancy rate of two and three-tenths per cent existed. The number of vacant dwelling units in the Bronx was 1,611 out of 140,814 surveyed, or a Bronx vacancy rate of one and one-tenth per cent. Chart V of that survey shows the alarmingly few vacant dwelling units where negro tenants are accepted. Of the 17,758 vacant units surveyed throughout the city, only 1,367 were available to negro tenants, and of these there were only forty-three in the Bronx, of which twenty-three were rented for less than thirty dollars per month.

The report of the New York city housing authority of January 25, 1937, shows definitely that there is a dwelling crisis. Its causes need not be gone into here. Sufficient it is for a disposition of the present application that the acute shortage undeniably exists. National and local legislation in recent years is eloquent evidence of the mounting need for adequate housing. Upon establishing the State Housing Board (Laws of 1926, chap. 823) and municipal housing authorities (Laws of 1934, chap. 4), and in enacting the statute forbidding an increase in rents in old-law tenements upon which there are municipal violations (Laws of 1938, chap. 675), and in other statutes, the Legislature of this State has found that there exists an acute shortage of dwelling accommodations available to low-income families. The Congress of the United States, when creating the United States Housing Authority, has recognized the housing shortage as a national problem (U. S. Housing Act of

1937 [50 U. S. Stat. at Large, 888, 899; U. S. Code, tit. 42, §§ 1401 *et seq.*]). Amendment No. 4 to the New York State Constitution (Art. 18) was adopted by the People in November, 1938, as a definite recognition of the shortage in low-cost housing, and the duty of organized government with regard thereto.

The situation thus factually presented has been judicially recognized. (*Matter of New York City Housing Authority* v. *Muller*, 270 N. Y. 333; *Li-Mo Realty Corp.* v. *Davis*, 167 Misc. 829.) There is no doubt in my mind that the tenant " cannot within the neighborhood secure suitable premises similar " to those occupied by him and that he has " made due and reasonable efforts to secure such other premises." (Civ. Prac. Act, § 1436-a, subd. 2.) Nor do I have any doubt that the denial of a stay to this tenant for a reasonable time " would occasion extreme hardship to him or his family." (Civ. Prac. Act, § 1436-a, subd. 2.) I am convinced that the tenant's " application is made in good faith." (Civ. Prac. Act, § 1436-a, subd. 2.)

But, says the landlord, the tenant is to it objectionable, and, therefore, the section providing for a discretionary stay is, by its express terms, inapplicable. Subdivision 4 states that the " provisions of this section shall not apply * * * to a proceeding to recover possession upon the ground that an occupant is holding over and is objectionable if the landlord shall establish to the satisfaction of the court that such occupant is objectionable."

The present proceeding was not brought upon the ground that the tenant or any member of his family is objectionable. True, the landlord would probably not have desired to remove the tenant were the tenant's wife not deemed objectionable by it. But there is no allegation in the petition or mention in the notice to terminate the tenancy that the occupancy is objectionable to the landlord. I understand, of course, the motive for the landlord's proceeding, but it has not expressly based its action in law upon that motive. I hold that subdivision 4 of section 1436-a of the Civil Practice Act, properly interpreted, means that the court has the power to grant more than the usual five-day stay (Mun. Ct. Code, § 6, subd. 3), unless the proceeding to remove the tenant is brought upon the express ground that the tenant is objectionable, and that proper allegations are made in that regard.

But even were the statute to be contrariwise construed, I am of the opinion, on the facts in this case, that the landlord has failed to " establish to the satisfaction of the court that such occupant is objectionable," as required by the statute (Civ. Prac. Act, § 1436-a, subd. 4). I have listened to the testimony of the witnesses and observed their demeanor upon the witness stand. I do not believe

that Mrs. Coulter made any threats against the landlord's officers or agents. I do find that she was active in the organization of the tenants in the house for the purpose of collective action, and that such action was intended to be and was peaceful and lawful.

Certain it is that the mere fact that Mrs. Coulter was a member of a tenants' league or the organizer of a tenants' committee in the house cannot reasonably justify the conclusion that the occupant is " objectionable " within the meaning of the statute. The right of tenants to organize themselves into associations to advance their common interests is no different from the right of any other citizens to so organize themselves. Tenants are not pariahs in the law of associations. A tenants' organization is no different then an organization of manufacturers, employers, farmers, workingmen, doctors or lawyers. To hold that a landlord might reasonably consider a tenant objectionable because of membership in a tenants' association would leave the door open to discrimination against any member of any organization, whether it be professional, political or religious. Such a view strikes at the very foundations of our law and is inherently contrary to the principles upon·which our government and American democracy are built. The right of freedom of association is a fundamental democratic right. Its protection is implicit in the constitutional guaranties of freedom of speech, of assembly, and of petition.

It has been repeatedly recognized by students of our contemporary society that the complexities of modern economics are such that the individual cannot successfully cope with them. The trend, therefore, has been to organize in all realms. Employers have organized; workers have organized, manufacturers have organized; consumers have organized; landlords have organized, and tenants have organized. All these organizations, by protecting the interests of their respective members, serve the interests of society as a whole.

Our law has developed to the point where it grants legal recognition to all of these groups and societies. The problem is no longer one of the legality of such associations, but of ascertaining the allowable area of economic conflict permissible to these societies when their respective interests clash. With the development of the technique of collective action by these various groups, and with the recognition of association by their opposing groups, such conflict daily grows less common.

Generally speaking, the relations between a landlord and his tenants today are less satisfactory than almost any other common type of economic relationship. This is true although the two are dependent upon each other — by definition one cannot exist without the other. Sound housing management can make no better contribution

toward satisfactory landlord-tenant relations than to permit full and complete autonomy to tenant organization, and to deal with it as such. Just as employers with vision have come to recognize that the organization of their employees into labor unions for collective action is not objectionable, but, on the contrary, social instruments for the elimination of economic disturbances, so will landlords find the same to be true in their dealings with tenants' associations. The technique of collective bargaining in landlord and tenant relations, which has developed in recent years, has proven itself of substantial benefit not only to the tenants, but to the landlords who have accepted such technique. It is, in fact, today recognized by experts in the field of real estate management that collective bargaining with tenants is desirable. (Rosahn and Goldfeld, Housing Management, pp. 137–139, 192, 226, 229, 252, 335; Report and Recommendations of the Committee on Housing Management, Citizens Housing Council of New York, June, 1938, p. 30.)

From the point of view of social progress and of the administration of the law, the organization of tenants into representative associations is desirable and beneficial. Punitive statutes for the protection of the public and the tenant require vigilance for enforcement. Adequate legislation, in keeping with growing needs, must be enacted for slum clearance and public housing. The interests of the tenants in proposing, drafting and enforcing such legislation can be adequately presented to our legislative and administrative bodies by and through organizations of tenants.

Equally important is the necessity for collective action on the part of tenants in their bargaining relations with landlords. Rents, repairs, renovations, renting agreements, are mutual problems, and should not be conceived of as unilateral matters. The bench and bar of this city have long recognized, for example, the iniquitous hardships of a substantial number of the leases used in this city by landlords. The provisions of these leases in their various forms are outrageously unfair to the tenant. The Association of the Bar of the City of New York has for years been exerting its efforts to obtain a uniform lease which would eliminate such overreaching. While some responsible landlords have recognized this unfairness and have been making efforts to cure it, organized tenantry will be of effective assistance in solving the question.

Certain it is that the individual tenant, unorganized and alone, is in no position to strike a real bargain with his landlord at the time that he makes his lease. The terms are dictated to him by the landlord who presents him with the printed form on a take-it-or-leave-it basis. And every other landlord does the same. The

evil is identical with that presented in the realm of labor relations where, as recognized by the courts, the individual workingman is in no position to strike a real bargain with his employer. Just as in the realm of labor relations the worker can truly bargain for the terms and conditions he desires only through the labor union, so, too, the tenant in the city of New York can adequately bargain for the terms and conditions of his leasehold solely by and through an organization of tenants.

In yet another aspect is the tenants' association of substantial value. No one can long sit in this court without being impressed by the necessity for adequate legal representation for tenants. Landlords and their associations are uniformly well represented by able counsel. On the other hand, in the majority of cases, tenants are utterly ignorant of their rights and remedies under the law. Such adequate legal representation should be supplied to the impecunious tenant by and through a tenants' association.

Other advantages — to the tenant, to management, to society — might be mentioned. Suffice it to say that the organization of a tenants' association, just as the organization of a consumers' co-operative or a labor union, is not in any sense " trouble-making." This is a term which has been much abused, most frequently in attempts to conceal anti-social aims or selfish conduct. Landlords have for years organized in associations for their mutual satisfaction. Tenants who organize with their fellows for their own mutual advantages should not be penalized.

Rent, tenants must pay. Adequate bargaining power with landlords they are entitled to enjoy. Taxes, direct and indirect, tenants do pay. Sufficient voice in legislative, executive and judicial forums they are entitled to demand. These rights are better assured by collective action. To join an organization of tenants is no wrong; to organize such an association is equally no wrong. On the contrary, I am of the opinion that a *bona fide* union of tenants will better the living conditions of that third of a nation which is now ill-housed; and that the legitimate activities of that tenants' union will benefit our social structure. Blacklisting, discrimination, exorbitant rents, poor service, unsanitary housing, oppressive leases, are some of the recognized evils which can be ameliorated if not eliminated by an effective association of tenants. The law should encourage, not inhibit, such an organization. As long as the means employed are lawful, there can be no legitimate complaint — for the end is undoubtedly lawful.

In view of these circumstances of fact, of law and of policy, I cannot conclude that the landlord has established to my satisfaction that the occupant of the premises involved in the case at bar is " objectionable " in any proper sense of that word.

I determine, therefore, in the exercise of the discretion authorized by the statute, that the issuance of the warrant will be stayed to and including April 30, 1939, upon condition that the tenant, within five days of the service of a copy of the final order with notice of entry, deposit in court all past due rent unpaid to the date hereof (unless the same were paid direct to the landlord, as stipulated at the hearing without prejudice), and upon the further condition that the tenant thereafter deposit in court or pay direct to the landlord (also without prejudice to either party) the current semi-monthly rent, at the same rate heretofore paid, within five days from the respective due date, during the period of the stay.