Matthew M. Levy, J.
The petitioners seek by this proceeding under article 78 of the Civil Practice Act to review and to set aside an order of the State Rent Administrator directing the landlord of the Ritz Tower Hotel to restore ‘ ‘ room service ” to the occupants of four apartments in the premises. The subject building, a 37-story structure located at Park Avenue and 57th Street in Manhattan, New York City, was for many years operated by the owner, New York Towers, Inc., as an apartment hotel. The hotel restaurant was located on the first floor; and the tenants of the hotel had long been accustomed to receiving “ room service ” from this restaurant. In 1955, a plan of co-operative organization for the building was promulgated, and, on January 30, 1956, title was conveyed to Ritz Associates, Inc., the co-operative corporation. In accordance with the terms of the plan, the restaurant floor (with others) was rented to 465 Park Corp. under a long-term lease; *968 and that company undertook to provide restaurant and bar service. Insofar as the residential premises were concerned, proprietary leases were entered into between the new corporate owner, Ritz Associates, Inc., as lessor, with the individual owners of the approximately 150 apartments in the building as lessees. Some of these owners were tenants in occupancy of apartments controlled by virtue of the emergency statutes; some were tenants in occupancy of decontrolled apartments; some purchased vacant apartments for personal occupancy; others acquired vacant or occupied apartments for investment or resale.
Each of the four apartments involved in this proceeding was controlled, and they were acquired by the respective petitioners for investment or resale. These petitioners, as proprietary lessees, did not go into possession of the individual apartments purchased by them, since these residences were continued to be occupied by the statutory tenants. It appears that these four tenants had refused to participate in the co-operative plan, and, indeed, had been most active in opposition to it. On February 1, 1956, these tenants were told that they would no longer receive, service in their rooms of food and drink from the restaurant in the hotel (although the other residents of the hotel would receive such service) and that the four were free, if they wished, to receive room service from other restaurants in the neighborhood. The tenants so affected filed a tenant’s statement of violations with the Temporary State Housing Rent Commission, stating that the “ Ritz Tower Hotel” had denied the statutory tenants the “ room service ” to which they claimed they were entitled. After answer and hearing, the Rent Administrator ordered the landlord to restore room service as an “ essential service ” to which the statutory tenants were entitled. The order of the Administrator was not obeyed, and, on his application, a temporary injunction enjoining the landlord from withholding service was granted by Mr. Justice Hoestadter in this court, and, in due course, Mr. Justice Conloh granted a permanent injunction after trial. Both of my learned colleagues recognized that the determination of the injunction action did not adjudicate the merits of the landlord’s case (cf. Walker Memorial Baptist Church v. Saunders, 285 N. Y. 462), and that the remedy, if any, of the landlord was not collaterally to attack the order in the injunction action but to “ appeal ” from the Administrator’s ruling via an article 78 proceeding. Thus it is that the petitioners have now invoked that article and thereby seek a direct review pf the Administrator’s order,
*969 The proceeding which the petitioners bring is in the nature of a writ of certiorari. The province of the court is clear. Subdivision 6 of section 4 of the State Residential Rent Law CL. 1946, ch. 274, as amd. by L. 1957, ch. 755) makes plain the broad latitude of the Administrator in arriving at an order: “ Any regulation or order issued pursuant to this section may be established in such form and manner * * * as in the judgment of the commission are necessary or proper in order to effectuate the purposes of this act.” Subdivision 2 of section 9 of the law makes plain the narrow area of the court’s function in reviewing the administrative order: “No * * * regulation or order shall be enjoined or set aside, in whole or in part, unless the petitioner shall establish to the satisfaction of the court that the regulation or order is not in accordance with law, or is arbitrary or capricious.” Judicial recognition of this legislative caveat is plentiful indeed (Matter of Park East Land Corp. v. Finkelstein, 299 N. Y. 70; Matter of Mounting & Finishing Co. v. McGoldrick, 294 N. Y. 104; Matter of Kathy Realty Corp. v. McGoldrick, 281 App. Div. 850).
The petitioners argue, first, that they, as landlords of the four apartments in question, were not given notice of the hearing before the Administrator and that his order was not directed to them. The contention is without merit. It is true that the administrative order did not specifically name the petitioners. But the transcript of the hearings before the local rent administrator indicates that the petitioners had all the notice required for due process in an administrative proceeding. As proprietary parties in interest, they participated in every stage of this matter, through the medium of attorneys of their choice, who appeared for them. It would be a concession to the most extreme degree of unwarranted technicality to give any substantive consideration to the claim of the petitioners that they had no notice or that the order was not directed to them. Furthermore, despite the nature of the entity against whom the order was made, the court found no difficulty in awarding a temporary injunction and a permanent injunction in the litigation heretofore commenced against the corporate entities. The petitioners having appeared, answered and litigated in the proceeding before the commission and taken a protest, they are before the court now upon the merits of the order under review and these must be passed upon accordingly.
The petitioners contend, next, that 465 Park Corp., the present operator of the restaurant, is an independent company, and that the petitioners cannot compel 465 Park Corp. to provide room service. This contention is overruled on two *970 grounds. Firstly, it seems to me that, -if the statutory tenant is entitled to have an essential service restored, the alleged inability of the landlord to comply with the administrative direction for restoration should not be a ground for judicial vacatur of the order. And, secondly, the assertion that the restaurant concessionaire is truly independent in respect of this issue is not supported by the record. The principal reason for the formation of the ‘ ‘ independent ’ ’ corporation was to guarantee the beneficial tax aspects of the co-operative. The transcript of the hearings held before the local rent administrator indicates that there is some common ownership in the 465 Park Corp. and Bitz Associates, Inc., although the precise extent is not stated. And, moreover, it cannot be seriously disputed that the withdrawal of room service from these four tenants was a retaliatory measure, and that all of the parties concerned were and are acting in concert. It would be a far flight from the realities of the situation were the court to be deceived by the pretense that the restaurant company is truly independent in respect of this matter of room service.
I think it appropriate, at this point, to mention again and to dispose of the issue of revenge, frequently stressed by the Administrator in support of his order. While the fact that the tenants of the four apartments concerned are being discriminated against because of their opposition to the consummation of the co-operative plan, has, as I have indicated, a definite relation to the question of the alleged inability of the landlord to compel restoration of room service, the matter of retaliation as a relevant factor in the case ends there. On the basic issue before me, all suggestions in that regard are of no moment whatsoever, for, in my view, if room service is not an essential service, it matters not how it came to pass that it is no longer being furnished to the complaining tenants (cf. J. E. & A. Realty Corp. v. Coulter, 169 Misc. 871, affd. App. Term, 1st Dept., N. Y. L. J. April 22, 1939, p. 1852, col.7).
The petitioners urge that, in the leases, the old landlord never undertook to provide room service to the tenants in this apartment hotel. This fact does not preclude an administrative finding that, in certain circumstances, the elimination of such facility may nevertheless be the deprivation of an essential service which is subject to an order for its restoration (see Twentieth Century Associates v. Waldman, 294 N. Y. 571, 580). I find from the record that the necessary circumstances are present here. It is a conceded fact that room service has been furnished for many years. Although it is also a fact that it has at no time been the subject of a promise, nevertheless a *971 service rendered on the freeze date, or on any date when the maximum rent is determined (State Bent and Eviction Regulations, § 24; Matter of Kathy Realty Corp. v. McGoldrick, 281 App. Div. 850, supra), must be furnished — if the service is “ essential ” within the purview of the State Residential Rent Law — irrespective of the making of an enforcible promise to furnish that particular service; for it is the statute that requires its continuation, failing which there would be a diminution of service for which the rent commission or the tenant aggrieved could successfully institute an appropriate proceeding to compel compliance with the law.
The petitioners argue that, if the rendition of room service is held to be an essential service and is thus controlled, then control should extend even to the price charged for the food furnished. Whether or not that be so, it is not necessary so to hold in order to conclude that the service itself is essential within the meaning of the statute and the regulation. The fact that an additional charge is made for the food served and that it is not charged for as a part of the rent fixed does not alter the situation, if room service is furnished by the landlord and it is an essential service. Let us assume that an apartment was let for a specific monthly rental, to include maid service and laundry facilities in the premises, to be supplied by the landlord, with the charge for maid service being absorbed in the fixed monthly rent, and with the charge for the laundry machine used by the tenant being extra and the amount thereof being dependent upon use. I do not doubt that the withdrawal of the maid service and of the laundry utility by the landlord would be deemed by the courts the deprivation of essential services, if properly so held under the facts by the Rent Administrator, even though in one instance the service was a part of the rent and in another it was not.
And that brings me to the principal question — bearing in mind the legislative and judicial hortatives as to the respective jurisdictions of the Rent Administrator and of the court — did the respondent act arbitrarily or capriciously or without basis in law in holding that, under the facts here presented, ‘‘ room service ” is an “ essential service ”, within the meaning of the applicable statute and the governing regulations, which service the landlord may be compelled to restore?
The petitioners contend that the designation of room service as ‘' essential ’ ’ is arbitrary, unreasonable and capricious, since there is no basis in the State Residential Rent Law or the State Rent and Eviction Regulations for inclusion of this specific service. Wo do not get any definitive aid from a reading of *972 the precise language of the sections of the statute or of the regulations upon which the petitioners rely. Paragraph (b) of subdivision 5 of section 4 of the State Residential Rent Law or section 24 of -the State Rent and Eviction Regulations do not preclude the administrator from finding that room service is essential. These sections provide for the continuation of “ essential services ”, but do not define what they are. Indeed, in my view, those sections greatly weaken the argument of the petitioners, for section 24 of the regulations states that the landlord shall continue to provide “ the same essential services * * * as were provided, or were required to be provided ” at the freeze date of the maximum rent; and paragraph (b) of subdivision 5 of section 4 of the law provides discretionary power to the administrator to assure maintenance of what he shall deem essential services as they were provided at the freeze date.
It is undeniable that Ritz Tower is an “ apartment hotel” and that “room service” has been continuously provided in this apartment hotel since its erection and the inception of its operations as far back as 1927. The particular dependence, therefore, that the petitioners have placed upon the fact that subdivision 7 of section 3 of the State Rent and Eviction Regulations, defining hotels and listing ‘ ‘ customary ’ ’ services of hotels, does not list room service, is, I should say, misplaced. As I read this regulation, it is not intended to be exclusive and clearly does not purport to list all services which are customarily provided by all apartment hotels. It would be well at this point to look into what we mean by an “ apartment hotel ’ ’ and by “ room service ” — what the parties involved meant by these words and what the courts have meant by them. In that part of the old leases containing the mutual covenants of landlord and tenant (Rodney lease, par. 9; Low lease, par. 8), it is stated that the premises leased are located in an “ apartment hotel within the meaning' and provisions of section 181 of article 8 of the Lien Law of the State of New York ”. This statute defines an ‘‘ apartment hotel ’ ’ as including a hotel wherein apartments are rented for fixed periods of time, either furnished or unfurnished, to the occupants of which the keeper of such hotel supplies food, if required.”* The reason for the definition of “ apartment hotel ” as contained in the Lien Law is a helpful clue. As noted in Apartment Hotel Owners Assn. *973 v. City of New York (133 Misc. 881) the term “ apartment hotel ’ ’ was defined as it was in order to avoid the result of Shearman v. Iroquois Hotel & Apt. Co. (42 Misc. 217) where the landlord was unable to obtain a lien on the property of a tenant for food supplied the tenant on credit by the landlord. This, to me, is strong indication that the existing facility of providing service of food in an apartment hotel could not be discontinued except for nonpayment of rent. Other cases in which the courts have recognized that room service in apartment hotels has long been an integral part of such establishments are McMann v. Beaux Arts Apts. (146 Misc. 833), Waitt Constr. Co. v. Chase (197 App. Div. 326) and Cooper v. Schirrmeister (176 Misc. 474)*. In view of what I have pointed out in relation to the prevalence of room service in apartment hotels generally — and specifically in the light of the long-established practice in the Bitz Tower Hotel — the failure to mention this service as a “ customary ’ ’ one in subdivision 7 of section 3 of the State Bent and Eviction Begulations is, I hold, not determinative of the Administrator’s power to direct the restoration of that service.
Although I have not been persuaded to go along with the petitioners in the contention which they have pressed and which I shall next consider, their most cogent argument, it seems to me, is that an order of the Bent Administrator must be made in conformance with the purpose and intent of the State Besidential Bent Law, and that this is not the case here, for the instant order is not one which can be considered as having been made for the prevention of “ serious threats to the public health, safety and general welfare ” (State Besidential Bent Law, § 1). The petitioners urge that the statute was not intended to preserve conveniences for tenants merely because they have been enjoyed in the past, and that the State’s police power may not be invoked to afford tenants the pleasure of " breakfast in bed ’ ’, and that when the statute was enacted it was not contemplated that such service was a worthy subject for protection, even though it was provided on the freeze date. I appreciate that not every service is essential. What is or is not essential in any particular case necessarily depends upon *974 the facts and circumstances in that case. What is the situation in the case at bar?
Ritz Tower has long been recognized as a luxury hotel, located on perhaps one of the “ most fashionable ” corners in a great metropolis. One of the inducements for moving into the building at the outset was that it was an apartment hotel which offered the advantage of room service. And such facilities are desired not only by the lazy or the idle. The record here shows that because of age or illness and confinement to their residences, particularly in inclement weather, room service at such times was deemed necessary to some of the tenants. Room service was furnished the tenants during the usual meal hours even when the hotel restaurant was not open to the public — that is, before noon on weekdays and before 5:00 p.m. on Saturdays and Sundays. Thus, breakfast during the week or lunch on weekends was obtainable by tenants in their premises only by way of room service. In such circumstances, I cannot hold judicially that the rent commissioner erred administratively when he directed the restoration of room service. Nor does it seem to me that a statute which, in such circumstances, protected room service as an essential service would necessarily bespeak an effete civilization. The emergency statute here involved did not differentiate between the apartment-hotel resident and the slum-dweller. Equality of application has a practical as well as perhaps a constitutional base. It was undoubtedly felt that if all types of dwellings were to be brought within the purview of the act, the better would it be feasible in fact and in law to protect the occupants of the premises most in danger of being or becoming “ serious threats to the public health, safety and general welfare ”.
And legislative unwillingness to draw a line of demarcation such as suggested by the petitioners is not unusual. To mention but one or two examples: The Unemployment Insurance Law (Labor Law, art. 18) was enacted to avoid the economic stress occasioned an indigent worker who lost his job. The statute’s purpose as literally expressed, was not to protect the employee of substantial independent means. Yet, if an employed person is laid off, he is under the law entitled to collect unemployment insurance even though he may indeed be wealthy and will not truly suffer any financial burden because of his unemployment. The Social Security Act (U. S. Code, tit. 42, § 301 et seq.) was adopted to insure certain pension benefits to persons who reach retirement age, so that they will not become dependent on public or private charity in their late years. It cannot be said that the law’s intent was to make social security *975 available to the aged of means. Yet, if one reaches retirement age, and has through the years participated in the plan, he will under the law be entitled to receive his social security even though he may be as rich as Croesus himself. After the war, a cash bonus was awarded by the Congress to each veteran (U. S. Code, tit. 38, § 591 et seq.). The idea of the grant was to aid the soldier in rehabilitating himself economically when he returned to his civilian pursuits. It may be that the particular donee of the bonus was far from being in want, but under the law he was entitled to receive the bonus nevertheless. I need not cite further examples. Suffice it to say that in each instance there was no differentiation in the application of the statute to those who were or were not impecunious. It was felt by the legislative body that the statute should be applied to all alike irrespective of the economic condition of the recipient.
Let me get closer to the present statute. In Matter of First Terrace Gardens v. McGoldrick (1 N Y 2d 1) the residential buildings involved were located on West 23rd and 24th Streets, Manhattan, consisting of ten large apartment houses, each containing a manually operated passenger elevator and a manually operated service elevator, with a number of lobby attendants in each building. The owner desired to alter the premises so as to convert the manually operated elevators to automatic operation, to eliminate the entrances and lobbies in eight of the ten buildings (leaving only the lobby of each of the center buildings on each of the two streets on which the development was located), and to substitute two lobby attendants for those previously furnished. The court held that the State Rent Administrator did not improperly deny the owner permission to make the change, in that there would be a decrease in essential services, and an inconvenience and hardship to elderly people and a possible danger from intruders. In Shelton Properties v. Abrams (N. Y. L. J., Dec. 16, 1955, p. 5, col. 5; Irving L. Levey, J.), the court held that a “ decrease in services warranted the reduction in the maximum rent ” ordered by the Administrator. The subject premises was a hotel. The services involved were a second floor lounge and library facilities and the use of the solarium and terrace. The court held that permanent guests of the hotel “ had been deprived of certain lounge and library facilities which had been available to them before the new management discontinued the second floor lounge and library, and converted them into commercial space for banquet and meeting rentals ”, and that when the solarium and terrace were rented by the owner for commercial functions, there was “ a severe curtailment of their use by the guests ”. Whatever *976 one may think as to the force of the petitioners’ semantic argument that, dictionary-wise, " essential ’ ’ is synonymous with “ necessary ”, the words obviously do not have the same meaning in the present statutory context.
I have come to the considered conclusion that room service in a luxury hotel of this type, history and location may properly be held to be an essential service and that the order attacked is in consonance with the purposes of the State Residential Rent Law. I hold, therefore, that the Administrator had the power to order that the pre-existing essential level of operation be maintained by directing the restoration of such service. So that I might arrive at a decision on the basic question in this case, I found it necessary to examine the background basis for the emergency legislation, as well as its functioning, and the complete record in this specific matter before the rent commission, encompassing the story of the Ritz Tower Hotel project and operations from the beginning and throughout the years. For, in making a determination here, the construction, size, type, location, leasing arrangements, facilities, utilities and services of the subject building are all relevant factors in deciding whether a particular service is or is not essential (see Matter of Jerlan Holding Corp. v. McGoldrick, 203 Misc. 305, affd. 281 App. Div. 545). In the circumstances, precedents — indeed, whether they hold one way or the other — are hardly helpful, for, in the main, the facts in each case control the result. I shall, nevertheless, comment on several of the cases relied upon by the petitioners.
There is nothing in Fogelson v. Rackfay Constr. Co. (300 N. Y. 334) to cause me to decide differently. In that case an action was brought by tenants to enjoin a landlord from terminating bus service which had been provided for a long period of time in accordance with an alleged oral agreement. The court refused to grant the injunction, holding that the lease embodied the entire agreement between the parties and could not be varied by parol evidence of supplementary agreements, and that the continuation of the voluntary furnishing of bus service could not be compelled in the future, although it had been provided by the landlord for many years. The rent commission had not been called upon to intervene in the Fogelson controversy. The case now before me is quite different. Here the administrative agency established by the Legislature to ascertain the facts, and to apply the statutory controls to the facts as found, has done just that. Since I cannot say that the order attacked by the petitioners is arbitrary, capricious, unreasonable or unlawful, I am not empowered to *977 reverse the determination (Matter of Motta v. Temporary State Housing Rent Comm., 202 Misc. 341; Matter of Brown v. McGoldrick, 203 Misc. 1027; Matter of Mayfair-York Corp. v. McGoldrick, 206 Misc. 925, affd. 285 App. Div. 945; Matter of Servedio v. Abrams, 208 Misc. 397; Matter of Feinberg v. Abrams, 208 Misc. 568).
In Matter of Ellinger v. McGoldrick (281 App. Div. 821) telephonic switchboard service was held not essential when the record showed that such service in the subject building was negligible, that it required operation by the landlord at a substantial loss, and that the telephone company would promptly install private telephones for the tenants concerned. There is no such correlative proof here with respect to any similar facet of the case at bar.
People ex rel. McGoldrick v. Regency Park (280 App. Div. 804, affd. 305 N. Y. 650) involved the furnishing by a landlord of its roof for the maintenance by a tenant of a television antenna. It was added space — not the rendition of a service —which the court held that the tenant was not entitled to obtain when his lease had not provided for it. Moreover, the court may well have been concerned with the administrative order because it was of the view that the rent control law should not be used to vary existing rental practices under the guise of maintaining essential services. On the other hand, it is immediately apparent that the existing practice in the case at bar — and for 29 years prior thereto, and even today (except for the four tenants interested) — is to provide room service. And in that regard I quote from the language contained in the co-operative prospectus in this case: “ The Ritz Tower * * * was designed to provide outstanding apartment hotel accommodation for discriminating people. For the site, they selected the world’s most fashionable corner, Park Avenue at 57th Street. The result was The Ritz Tower, acclaimed from the day of its opening as one of New York’s truly magnificent structures. Outside and in, The Ritz Tower gives evidence of the dominant idea of its designers, superiority in every respect. * * * The Ritz Tower heritage lives on * * * and under the new Cooperative Plan this manner of living will be preserved for those who purchase apartments in the Ritz Tower ”. Statutory tenants are similarly entitled to the continuance of services that are essential in the circumstances.
The application is denied, and an order has been signed to that effect.

 The contention of the petitioners that the tenants can get food and drink brought in to their apartments from any other restaurant in the neighborhood is without merit. It is quite clear that, in an apartment hotel, “room service” is a service provided by the keeper of the hotel, not by complete strangers.

 Some of the eases involve situations where no cooking facilities whatsoever were provided to the tenants in their apartments. Where such facilities were provided, the tenants were designated as "apartment” dwellers. The dual situation presented in some of the instances in the present case — having kitchen facilities as well as restaurant services — does not affect the result, for the leases expressly state that the tenants are “ apartment hotel ” dwellers, and room service has always been supplied to the occupants of these apartments as well as to those who had no inside kitchen or pantry facilities.